UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KEITH LAMAR DAVIS,

                    Petitioner,                    Case No. 1:07-cv-368

v.                                                 Honorable Robert Holmes Bell

CARMEN D. PALMER,

                    Respondent.
_____/


## REPORT AND RECOMMENDATION

            This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Promptly after the filing of a petition for habeas corpus, the Court must undertake a

preliminary review of the petition to determine whether "it plainly appears from the face of the

petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court."

Rule 4, RULES GOVERNING § 2254 CASES; *see* 28 U.S.C. § 2243.  If so, the petition must be

summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court

has the duty to "screen out" petitions that lack merit on their face).  A dismissal under Rule 4

includes those petitions which raise legally frivolous claims, as well as those containing factual

allegations that are palpably incredible or false.  *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir.

1999).  After undertaking the review required by Rule 4, I recommend that the petition be dismissed

in its entirety.

### Facts and Procedural History

Petitioner is incarcerated in the Riverside Correctional Facility.  He was convicted in the Berrien County Circuit Court of second-degree murder, MICH. COMP. LAWS § 750.317, for the death of Roshanda Bownes.  On January 29, 2004, the trial court sentenced him to a term of imprisonment of 40-to-100 years.

Petitioner is represented in this action by the State Appellate Defender's Office (SADO).  SADO has submitted its appellate brief, filed in the state courts, in support of petitioner's federal habeas claims.  That brief presents the following summary of the evidence presented at trial:

> Dr. Stephen Cohle, a forensic pathologist, who examined the body, testified about the two autopsy reports that had been produced from his examination.  Dr. Cohle was recognized by the court as an expert witness.  (Vol. I 132).  Dr. Cohle testified that on March 18, 2003, he performed an autopsy on the body of Roshanda Bownes.  Dr. Cohle testified that in performing the autopsy he first examined the body externally, noting scars, wounds, and other markings.  (Vol. I 134).  During his external examination he searched for evidence of disease and injury.  (Vol. I 134).  Then extra testing was performed on organs and bodily fluids.  (Vol. I 134).  Dr. Cohle then wrote a report with his conclusions on the cause of death and the manner of death.  (Vol. I 134).

> Dr. Cohle testified that he was highly suspicious of the circumstances surrounding the discovery of the body, and thus, was searching for any signs of a homicide during his examination.  (Vol. I 157.)  He found no evidence of homicide.  (Vol. I 157).  Dr. Cohle testified that Roshanda Bowne's body has evidence of "moderate" decomposition and skin discoloration which made it slightly more difficult to identify some injuries but not impossible.  (Vol. I 135, 138).  Dr. Cohle testified that deeper bruises would be visible despite decomposition.  (Vol. I 166).  He further testified that in Roshanda Bowne's case there was no identifiable external evidence of injuries.  (Vol. I 135).  She did not have any evidence of injury to the head or neck.  (Vol. I 136).  The bony and cartilaginous structures of the neck were completely intact.  (Vol. I 136).  The internal examination revealed no evidence of disease.  (Vol. I 136).

> Finding no evidence of any injury from his extensive internal and external examinations of the body, Dr. Cohle then performed toxicology testing on the body.  (Vol. I 139).  During the drug screen of the body, Dr. Cohle found cocaine and a major breakdown of cocaine in the liver.  (Vol. I 140).  There were 0.8 grams of cocaine per kilogram of liver and 6.2 milligrams of cocaine's breakdown product,

- 2 -

benzoylecgonine (B.E.) per gram of liver. (Vol. I 141). Dr. Cohle concluded that the B.E. had been cocaine before it was broken down by the body. (Vol. I 160). Dr. Cohle testified that he assumed that the level of B.E. in the liver was the same level of cocaine that at one time in the blood. (Vol. I 160). However, there is a possibility that it was never that high of a level, and the B.E. was built up over time. (Vol. I 160).

Dr. Cohle stated that though the level of actual cocaine in Bowne's system was just that of someone using it recreationally, the level of B.E. "was pretty high." (Vol. I 141). He further testified that although there is no absolute level of toxicity for cocaine, the level found in the body of Roshanda Bownes "would certainly be lethal for many people." (Vol. I 143, 161). Dr. Cohle testified that in the preliminary hearing he had stated that "it would be a level that many cocaine users never achieve." (Vol. I 161). In addition, the body showed evidence of scarring of the heart. (Vol. I 173). The doctor further admitted that the presence of scarring could have made it easier for Bownes to die of a cocaine overdose. (Vol. I 173). In addition, any adrenaline cause by a struggle mixed with the cocaine in the decedent's system could have caused a fatal heart rhythm. (Vol. I 174). Dr. Cohle concluded in the initial completed autopsy report that the cause of death was acute cocaine intoxication. (Vol. I 146). He also stated that the manner of death was an accident. (Vol. I 147).

Officer Robert O'Brien testified that on March 31, 2003, Keith Davis came to the police station to give a statement on the death of Roshanda Bownes. (Vol. II 260). Keith Davis stated that he had known Bownes for some time and that they were friends. Davis made a statement that he had met up with Bownes on March 14, 2003. (Vol. II 262). Although it was unclear who provided the cocaine, Davis stated that he and Bownes smoked cocaine, had sex, and drank a few drinks. (Vol. II 263). Initially, Davis stated that he had last seen Bownes walking away from his home. (Vol. II 264). When further questioned, Davis stated that he and the decedent had fallen asleep, and that when Davis awoke, Bownes was dead. (Vol. II 266). In his statement, Davis explained that he did not think that anyone would believe him, so he sat around for a day drinking and smoking. (Vol. II 267). On March 17, 2003, Davis borrowed his sister's van and moved the body to the back of the Summit Powders building where it was later discovered. (Vol. II 269). He then cleaned the van and returned home. (Vol. II 270-271). On Monday, March 18, 2003, he left to go to Kalamazoo. (Vol. II 271). The prosecution admitted a bus reservation confirming this. (Vol. II 246).

On May 23, 2003, Davis voluntarily returned to the police station to revise his statement. (Vol. II 274). According to the testimony of Officer O'Brien, "[Davis] looked as if he had been smoking crack cocaine nonstop." (Vol. II 276). O'Brien did not believe that Davis was intoxicated at that time. (Vol. II 276). Davis explained the evening of March 14, 2003, in more detail and repeated that he and Roshanda had been smoking an excessive amount of crack cocaine and engaging in

sexual intercourse.  (Vol. II 278).  He stated that he had gotten paranoid during his cocaine high, and became worried that someone would be alerted to what they were doing by Roshanda's talking.  (Vol. II 278).  Bownes became increasingly loud and argumentative.  (Vol. II 278).  In order to calm Bownes down, Davis went behind her and put one hand over her mouth and another around her throat, for a minute or so, until she quieted down.  (Vol. II 278-279).  Her nose was never covered.  (Vol. II 288-289).  Bownes fell to the floor, and Davis walked away, telling her to "Quit playing."  (Vol. II 279).  When he checked on her and realized that she was no longer breathing, he attempted to revive her.  (Vol. II 280).  Petitioner stated that he loved Ms. Bownes and had not meant to harm her.  All other statements conformed to his previous conversation with the police.  (Vol. II 280).

Dr. Cohle testified that after the States Attorney alerted him of Davis' confession, he issued a second autopsy report.  Without reexamining the body, Dr. Cohle changed the cause of death on the new report to "homicidal asphyxia."  (Vol. I 149).  He stated that he based his conclusion of death by strangulation totally on Davis' statement to the police.  (Vol. I 169).  Dr. Cohle stated that if a thirty-one year old woman were strangled with someone's hand, "there would be some bruising, maybe a lot."  (Vol. I 164).  Dr. Cohle could not recall a single case of strangulation in which there was no visible bruising.  (Vol. I 163).  Dr. Cohle agreed that in about 80% of the strangulation cases he would normally find a petechial hemorrhaging of the eyes.  (Vol. I 169).  The Doctor further confirmed that in a moderately decomposed body, like that of the decedent, petechial hemorrhages would have been evident.  (Vol. I 171).  There were no such injuries evident on the body of Bownes.  Dr. Cohle testified that he had read of only one way in which strangulation might result in no signs of injury: when a trained police officer uses a technique in which the flat part of one's forearm is drawn across the neck and compresses the airway.  (Vol. I 167).  No one claimed and there was no evidence showing that Davis had used this technique on Bownes.  Because there was no evidence of bruising in his external or internal examination of the body, Dr. Cohle affirmed that if not for the confession, this would be classified as a death by cocaine overdose.  (Vol. I 161).

The only other incident that Dr. Cohle could recall in which he changed the autopsy report was a scenario in which he changed the manner of death from suicide to murder.  (Vol. I 148).  This was a shooting incident in which the only witness testified that the decedent had shot himself.  (Vol. I 148).  After Dr. Cohle had classified the manner of death as a suicide, the witness confessed that he had shot the decedent.  (Vol. I 148).

Larry Franklin testified that he was friends with Bownes.  (Vol. II 213).  He further testified that he spent time with the decedent on the afternoon on the day of her death.  (Vol. II 264).  He testified that he was aware that Bownes regularly smoked cocaine.  (Vol. II 217).  Sanford Proctor testified that he was dating Bownes.  (Vol. II 219).  Proctor admitted that he had smoked crack cocaine with Bownes on

March 14th before she left to meet with Davis.  (Vol. II 223). He stated that Bownes had a cocaine habit. (Vol. II 224).

\*\*\*

Richonda Lynettte Davis, the sister of petitioner Keith Davis, testified that on the morning of March 16th Keith Davis borrowed her van.  (Vol. II 237).  He returned the van about an hour later and washed it inside and out. (Vol. II 237).  She testified that they had spoken earlier about his cleaning her van, and that Keith had cleaned Richonda's van more than ten times in the past. (Vol. II 245).

Hugh W. Davis testified that he was Keith Davis' father, and that the house in which Bownes died was owned by him.  (Vol. II 248). He further testified that he was aware that a relationship existed between the defendant and Bownes.  (Vol. II 249). He then testified that he was not aware that Bownes had died in his house until two or three weeks after her death.  (Vol. 11 251).

Nikki Renee Jackson testified that she was involved in an incident with the defendant.  (Vol. II 304). She testified that she struggled with him.  (Vol. II 304). First he choked her with one hand over her mouth and another around her neck. (Vol. II 305). Then he choked her with both hands around her neck until she defecated upon herself.  (Vol. II 305). She never reported the incident to the police because she had an outstanding warrant.  (Vol. II 305).

\*\*\*

The Defense called Carl Robert Deland.  Deland testified that Barbara McGee, the mother of the decedent, admitted that the decedent was experiencing pains in the left side of her body the week before she died.  (Vol. II 308).

The jury reached a verdict of guilty of murder in the second degree. (Vol. III 374). The jury was instructed on the lesser offense of manslaughter, but was not instructed on the lesser included offenses of involuntary manslaughter or the defense of accident. (Vol. II 353).

(Appellant's Brief on Appeal, 5-10, docket #1.)

Petitioner raised the following five claims on direct appeal in the Michigan Court of

Appeals:

I.     [PETITIONER'S] CONVICTION MUST BE REVERSED, BECAUSE THE PROSECUTION FAILED TO PROVE WITH EVIDENCE INDEPENDENT OF PETITIONER'S STATEMENTS, AN IMPORTANT ELEMENT OF CORPUS DELICTI OF HOMICIDE: THAT MS. BOWNES' DEATH WAS

CAUSED BY CRIMINAL AGENCY; THE DECISION OF THE COURT OF APPEALS WAS CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW. US CONST AM XIV.

II.    PETITIONER'S CONVICTION MUST BE REVERSED BECAUSE HE WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHEN THE TRIAL COURT ADMITTED UNDULY PREJUDICIAL EVIDENCE OF OTHER CRIMES AND BAD ACTS, SPECIFICALLY THE ALLEGED PREVIOUS CHOKING OF NIKKI JACKSON; THE DECISION OF THE COURT OF APPEALS WAS CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW. US CONST AM XIV.

III.    PETITIONER WAS DENIED A FAIR TRIAL BY THE INTRODUCTION OF EXPERT TESTIMONY THAT DID NOT QUALIFY FOR ADMISSION AS SCIENTIFIC EVIDENCE; THE DECISION OF THE COURT OF APPEALS WAS CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW. US CONST AM XIV.

IV.    PETITIONER WAS DENIED A FAIR TRIAL AND A PROPERLY INSTRUCTED JURY WHEN THE TRIAL COURT FAILED TO INSTRUCT ON THE FACTUALLY SUPPORTED DEFENSE OF ACCIDENT AND THE NECESSARILY INCLUDED LESSER OFFENSE OF INVOLUNTARY MANSLAUGHTER; TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO THE ABSENCE OF THESE INSTRUCTIONS; THE DECISION OF THE COURT OF APPEALS WAS CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW. US CONST AM XIV.

V.    PETITIONER WAS SENTENCED ON THE BASIS OF INACCURATE INFORMATION AND ON THE BASIS OF FACTS HE DENIED THAT WERE NOT PROVEN BEYOND A REASONABLE DOUBT, AND HE IS ENTITLED TO A RESENTENCING.  US CONST AM XIV.

The Michigan Court of Appeals affirmed his conviction in an unpublished *per curiam* opinion issued on October 18, 2005.  The Michigan Supreme Court subsequently denied his application for leave to appeal on May 31, 2006.  Petitioner now raises the same five grounds for habeas corpus relief. He continues to be represented in this action by the Michigan Appellate Defender's office.

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001), *cert.*

*denied, Texas v. Penry*, 126 S. Ct. 2862 (June 12, 2006). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).[1]

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

---

[1] Petitioner's SADO attorneys completely misapprehend the meaning of this rule, either because of ignorance or wilfulness. Habeas corpus relief is available only for a violation of a criminal defendant's federal constitutional rights. 28 U.S.C. § 2254(d). Consequently, the only Supreme Court authority relevant to this inquiry is authority enunciating constitutional rights binding on the states in criminal proceedings. Rather than citing Supreme Court authority enunciating federal rights, SADO relies on cases involving rules of criminal procedure for federal prosecutions (which are not binding on the states in the absence of a constitutional underpinning) or, worse yet, federal rules of evidence. As is shown below, this effort is legally and analytically fruitless.

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

### Discussion

I.     Corpus Delicti Rule

The forensic pathologist who examined the decedent initially concluded that the victim died of accidental cocaine intoxication.  The pathologist changed his conclusion from accidental death by cocaine intoxication to homicidal asphyxia after he learned that Petitioner had confessed to strangling the decedent.  Petitioner claims that the trial court violated Michigan's corpus delicti rule and his due process rights by admitting Petitioner's inculpatory statements when the prosecutor was unable to establish through independent evidence that the victim died from a criminal agency.  On appeal, the Michigan Court of Appeals concluded that the evidence was sufficient to support, by a preponderance of the evidence, that the decedent's death was caused by some criminal agency.  Consequently, the court found no violation of the *corpus delicti* rule.  *People v. Davis*, No. 244254, 2005 WL 2656646, at *2-5 (Mich. Ct. App. Oct. 18, 2005) (unpublished per curiam).

Petitioner's counsel does not assert that the evidence ultimately received at trial was insufficient to sustain a finding of guilt beyond a reasonable doubt.  Rather, counsel argues that Petitioner's admission of guilt should not have been received into evidence because of the prosecutor's failure to first present independent evidence of every element of the crime as required by Michigan's "*corpus delicti* rule."  Counsel argues that, in the absence of the improperly admitted confessions, the remaining evidence is insufficient to sustain a finding of guilt of second-degree murder beyond a reasonable doubt.  For the reasons set forth below, I conclude that the *corpus delicti* rule does not embody a federal constitutional principle and that Petitioner's reliance upon it must be rejected.

The so-called *corpus delicti* rule has its origin in the English common law of the 18th century.  *See* VII WIGMORE, EVIDENCE § 2070 at 508-10 (Chadbourn Rev., 1978).  In its purest form,

the rule prevents conviction of a defendant in a homicide case on the basis of his uncorroborated confession alone. *Id.* According to Professor Wigmore, the rule was imported into this country as a result of Professor Greenleaf's evidence treatise, published in 1842. WIGMORE, § 2071 at 511. Courts in this country adopted at least two versions of the rule. The minority required only that the confession be corroborated by evidence tending to show that the confession was trustworthy. *Id.* at 511. The stricter, majority rule required that the "*corpus delicti*" of the crime be established by evidence *aliunde* the confession before the confession became admissible. *Id.* at 516. This generally required production of some evidence on each of the essential elements of the crime as a prerequisite to admission of the confession. *Id.*

The *corpus delicti* rule found its way into the common law of the State of Michigan. Early cases seem to vacillate between the minority and majority iterations of the rule. For example, in *People v. Mondich*, 208 N.W. 675 (Mich. 1926), the court held that the *corpus delicti* rule was satisfied by proof, independent of defendant's statement, that the victim was dead as a result of some criminal agency. By contrast, other early cases held that the *corpus delicti* was not established until the prosecution showed all the elements of the offense by evidence extrinsic to the confession. *See, e.g.*, *People v. Paton*, 279 N.W. 888 (Mich. 1938). In its last major decision in the area, the Michigan Supreme Court adopted the less stringent view, holding that the *corpus delicti* rule is satisfied in a homicide case by independent evidence showing that the named victim is dead as a result of some criminal agency. *People v. Williams*, 373 N.W.2d 567, 570-72 (Mich. 1985). The *Williams* court pointed out that the historic purpose of the *corpus delicti* rule was to guard against conviction for a criminal homicide when none was committed, and that this goal was served by a showing that the victim's death was a homicide. 373 N.W.2d at 570. In *People v. McMahan*, 548 N.W.2d 199, 201 (Mich. 1996), the state supreme court adhered to its version of the rule, declining

the prosecution's invitation to adopt the more lenient "trustworthiness" rule applied in federal criminal prosecutions.

It should be patent from the foregoing discussion that the *corpus delicti* rule is a principle of state common law with no constitutional underpinnings. The rule has been substantially abandoned in the federal system since 1954. In the companion cases of *Opper v. United States*, 348 U.S. 84 (1954), and *Smith v. United States*, 348 U.S. 147 (1954), the Supreme Court rejected the traditional *corpus delicti* doctrine, holding instead that confessions and admissions must be corroborated "by substantial independent evidence which would tend to establish the trustworthiness of the statement." 348 U.S. at 93. On the basis of *Opper* and *Smith*, the circuit courts of appeals now uniformly consider the traditional *corpus delicti* rule to be abrogated in federal prosecutions. *See*, *e.g.*, *Government of Virgin Islands v. Harris*, 938 F.2d 401, 408-10 (3d Cir. 1991); *United States v. Kerley*, 838 F.2d 932, 939-40 (7th Cir. 1988) ("The *corpus delicti* rule no longer exists in the federal system."); *see generally* 2A WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 414 at 122-23 (2000). In cases in which it is still applied, courts treat the *corpus delicti* rule as one governing "the admissibility of evidence, not the sufficiency of evidence to convict." *Harris*, 938 F.2d at 409 n.6 (applying Virgin Islands law); *see Martin v. United States*, 335 F.2d 945, 951 (9th Cir. 1964) (*corpus delicti* rule governs only order of proof, a matter within the court's discretion). The state supreme court decision in *McMahan* should remove any doubt that the Michigan *corpus delicti* doctrine is a rule of state common law, and not a federal constitutional principle. 459 N.W.2d at 1201.

The federal courts may issue a writ of habeas corpus to release a state prisoner only on the ground that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). Accordingly, a petition states a claim for federal habeas relief only if

it alleges that petitioner is in custody in violation of a federally guaranteed right.  *See Mabry v. Johnson*, 467 U.S. 504, 507 (1984).  The Supreme Court has held that federal habeas relief is not available for alleged errors in the admission of evidence or in other issues governed by state law. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  The Sixth Circuit clearly does not consider alleged violation of Michigan's *corpus delicti* rule to be an issue of constitutional magnitude sufficient to support habeas corpus relief.  *See Williams v. Lecureux*, No. 92-2476, 1993 WL 445090 at * 1 (6th Cir. Nov. 2, 1993) (*corpus delicti* issue is "purely state law" question not reviewable in habeas); *Chambers v. Jago*, No. 86-3913, 1987 WL 37568 (6th Cir. June 2, 1987) (*corpus delicti* rule not constitutionally mandated); *Templeton v. Foltz*, No. 85-1223, 1986 WL 18450 at * 1 (6th Cir. 1986) (district court "correct in its conclusion that the *corpus delicti* rule is a creature of state law and does not carry with it implications of violation of federal constitutional law").

Consequently, Petitioner's position is based upon a misapprehension of the scope of habeas review.  No holding of the Supreme Court has ever applied the *corpus delicti* rule to the states as a matter of federal constitutional law.  To the contrary, the Court has held that issues of state substantive criminal law or procedure are insufficient to warrant habeas relief.  *See e.g., Estelle*, 502 U.S. at 67-69.  Petitioner's attempt to present an alleged *corpus deliciti* violation as a matter of federal due process is completely unavailing, as the Supreme Court has never said that the Due Process Clause guarantees any rights in this area.

In summary, I conclude that application of the state *corpus delicti* rule on habeas review is completely unwarranted, as the habeas court is limited to federal constitutional claims, not ancillary state evidence rules.  Petitioner brazenly invites this Court to overrule the state courts on a purely state-law issue.  Such an undertaking is outside the scope of this Court's habeas corpus authority.

II.        Admission of Bad Acts Evidence

In his second ground for habeas corpus relief, Petitioner claims that the trial court

erred when it admitted prejudicial other acts testimony against him in violation of MICH. CT. R.

404(b) and his Fourteenth Amendment right to due process.   The Michigan Court of Appeals

provided the following factual background:

> Before defendant's preliminary examination, plaintiff gave notice that he
> intended to present three witnesses who would testify about other acts committed by
> defendant.   One of these witnesses was Nikki Jackson.[2]   According to Jackson,
> defendant kidnapped, physically assaulted, and raped her.   Jackson also stated that
> defendant said he was going to kill her and, when she began to yell, placed one hand
> over her mouth and the other over her throat and choked her until she defecated and
> nearly passed out.   Jackson said defendant only spared her life because he realized
> she was not the person he had thought she was.
>
> At the preliminary examination, defendant's trial counsel objected to all three
> witnesses on the basis that their testimony was not relevant to prove a fact other than
> bad character or a propensity towards violence.   He also objected to Jackson's
> testimony on the ground that it was particularly graphic and, therefore, too
> prejudicial.   At the preliminary hearing, the trial court ruled that the other acts
> testimony was admissible to prove motive and intent, but left open the possibility that
> defendant's trial counsel might bring a motion to address the prejudicial nature of the
> details involved in Jackson's testimony.   At a hearing held on January 12, 2004, the
> trial court heard additional arguments concerning Jackson's testimony.   The court
> concluded that the testimony was admissible to show intent but that certain aspects
> of Jackson's testimony were prejudicial.   However, rather than prohibit her testimony
> altogether, the trial court limited plaintiff to eliciting testimony that, "during a
> struggle, the Defendant placed one hand over her mouth and one hand around her
> neck choking her until she defecated upon herself and nearly passed out."   Further,
> the court ordered that Jackson was specifically precluded from testifying that
> defendant kidnapped, raped or threatened to kill her.

*Davis,* 2005 WL 2656646, at *6.

The court of appeals concluded that the trial court did not abuse its discretion by

admitting Jackson's testimony.   The court found that the evidence was appropriate to establish

Petitioner's motive and intent.   *Id.* at *7.   In addition, the court found that Jackson's testimony

---

[2]The other two potential witnesses did not testify at trial.

tended to show that Petitioner either intended to cause Bownes' death when he choked her or that he was aware that the natural tendency of this act was to cause death or great bodily injury; thus, the testimony was relevant to prove the malice element of second-degree murder. *Id.* The court of appeals further concluded that the trial court limited the danger of unfair prejudice by carefully limiting the scope of the testimony. *Id.*

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle*, 502 U.S. at 67-68, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Petitioner cannot meet this high burden. In light of Petitioner's statement to police that he put one hand over the victim's hand and another hand around her throat, it was appropriate for the prosecutor to introduce Jackson's testimony to establish Petitioner's motive or intent to harm the victim in this case. Moreover, the trial court carefully limited Jackson's testimony to the details regarding the choking, and precluded her from testifying that Petitioner kidnapped, raped and

threatened to kill her.  Petitioner, therefore, was not denied a fair trial as the result of Jackson's testimony.

Petitioner's discussion of this issue focuses only on federal and state cases decided under Evidence Rule 404(b).  Habeas corpus courts do not decide issues of state evidence law.  SADO's discussion is completely lacking in the only authority relevant to a habeas claim -- the existence of a clearly established *federal constitutional* right abridged by the state courts.  Either SADO does not understand the difference between the Constitution and the rules of evidence, or it believes that the federal courts can reverse the state courts on questions of the application of the Michigan Rules of Evidence.   In either case, counsel is mistaken.  The only evidentiary errors that can support habeas relief are those that are so egregious that they deprive the defendant of a fair trial.  Petitioner's showing does not remotely qualify.

III.   Admission of Expert Testimony

Petitioner next contends that the trial court erred when it permitted the introduction of expert testimony contrary to M.R.E. 702 and M.R.E. 703.  Specifically, Petitioner contends that the medical examiner's opinion, which was based solely on his confession, was improperly admitted without ensuring that the conclusions were based on admitted evidence, reliable data and methodology.  Because Petitioner failed to object to the admission of the medical examiner's testimony and reports on this basis at trial, the court of appeals reviewed the claim only for plain error affecting Petitioner's substantial rights.  *See  Davis*, 2005 WL 2656646, at *7.  The Michigan Court of Appeals found no plain error, stating:

> Defendant does not contend that Cohle was not an expert in his field or that the trier of fact  would not benefit from his testimony regarding his findings from the autopsy of the decedent, but rather argues that Cohle's use of defendant's confession in determining the decedent's cause of death in his second autopsy report should have been excluded as unreliable under MRE 702.  Defendant further argues that, because

his confession was not properly admitted, it could not serve as the basis of an opinion under MRE 703. As already noted, defendant's confession was properly admitted into evidence. Therefore, defendant's argument that Cohle could not base his opinion on defendant's confession under MRE 703 is without merit. Furthermore, at trial, defendant stipulated to the admission of Cohle as an expert forensic pathologist and Cohle testified that it was normal practice within his profession to use all available information in the determination of a decedent's cause and manner of death. Defendant did not and has not presented any evidence to contradict this testimony. Therefore, defendant has failed to demonstrate that the admission of Cohle's testimony and reports amounted to plain error affecting his substantial rights.

*Davis*, 2005 WL 2656646, at *8.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004), *cert. denied*, 544 U.S. 928 (2005); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 126 S. Ct. 2064, 2076 (2006)*; Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.

The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 126 S. Ct. at 2076-77. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim.  It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial.  *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271 (1985).  A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee*, 534 U.S. at 385.  Petitioner's failure to comply with the state's independent and adequate state procedural rule, i.e., making a contemporaneous objection, caused him to default his claims in state court.  *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).  After expressly noting Petitioner's default in failing to object, the Michigan Court of Appeals reviewed Petitioner's claim for plain error, finding none.  In this circuit, "plain error review does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *Atkins v. Phillips*, No. 00-1150, 2000 WL 1720719 (6th Cir. Nov. 8, 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice").

Accordingly, review by this Court is barred unless Petitioner can show cause and prejudice, or that he is actually innocent. *See House*, 126 S. Ct. at 2076; *Murray,* 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52. Even if Petitioner could show cause and prejudice for his default, his claim fails on its merits. *See Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999) (agreeing that the district court may assume without deciding that there was no procedural default by the petitioner and decide the merits of the case). Petitioner's claim concerns an evidentiary decision by the trial court. As discussed above, state-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour*, 224 F.3d at 552; *accord Coleman*, 268 F.3d at 439; *Bugh*, 329 F.3d at 512. Petitioner clearly was not denied a fundamentally fair trial as the result of Dr. Cohle's testimony. Plaintiff does not question Dr. Cohle's qualifications as a forensic pathologist. Instead, he maintains that Cohle should not have been permitted to testify regarding his second autopsy report because "the conclusion that the cause of death was homicide was based on defendant's inculpatory statement (see Issue I) and on 'junk science.'" (Appellant's Br. on App., 29.)

In a now-familiar pattern, Petitioner's counsel completely misapprehends the requirement that a federal habeas claim be grounded in the holdings of the United States Supreme Court. Although superficially recognizing this requirement, SADO then relies on *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and other *civil cases* decided by the Supreme Court under the Federal Rules of Evidence. This is sanctionable. The Supreme Court has never required that the states enact the federal rules of evidence, nor has the Court held that the requirements for admitting expert testimony in federal cases under Rule 702 have any constitutional underpinning. The only "clearly established federal law" involved in this case is federal evidence law, which is utterly irrelevant to state prosecutions. The state legislature and courts are the final expositors of state

evidence rules, and this court has no authority to reverse state convictions on the basis of an alleged *Daubert* violation.  This claim is plainly not cognizable in habeas corpus.

IV.    Jury Instructions/Ineffective Assistance of Counsel

Petitioner claims that he was denied a fair trial when the trial court failed to *sua sponte* instruct on the defense of accident and the lesser included offense of involuntary manslaughter.  He further claims that his trial counsel was ineffective for failing to request the instructions.  While Petitioner asserted both trial court error and the ineffective assistance of counsel on direct appeal, the Michigan Court of Appeals addressed only Petitioner's claim of ineffective assistance of counsel.  Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented.  *See Harris*, 212 F.3d at 943.  However, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer."  In such circumstances, the Court conducts *de novo* review.  *McKenzie*, 326 F.3d at 727; *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).  Therefore, I will review *de novo* Petitioner's claim of trial court error.

**A.    Trial Court Error**

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process."  *Henderson v. Kibbe*, 431 U.S. 145, 155

(1977); *see also Estelle*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same).  If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law.  *Id.*  In the instant case, the trial judge's failure to *sua sponte* instruct the jury as to the defense of accident did not prejudice Petitioner's due process rights.  The jury heard Petitioner's statements to police that he was just trying to quiet the victim down and did not mean to harm her.  If they believed him, they could have found that he did not possess the requisite intent for second-degree murder or voluntary manslaughter, both of which require a finding of malice.

Likewise, the trial court's failure to *sua sponte* instruct the jury on involuntary manslaughter did not violate Petitioner's due process rights.  The Sixth Circuit Court of Appeals, sitting *en banc*, has held that the failure to give an instruction on a lesser-included offense, even when requested by counsel, is not of the "character or magnitude which should be cognizable on collateral attack."  *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (*en banc*).  The *Bagby* Court held that failure to instruct on lesser-included offenses in a noncapital case is reviewable in a habeas corpus action only if the failure results in a miscarriage of justice or constitutes an omission inconsistent with the rudimentary demands of fair procedure.  *Id.*; *accord Samu v. Elo*, No. 00-1184, 2001 WL 814929, at *1 (6th Cir. July 9, 2001); *Williams v. Hofbauer*, No. 00-1526, 2001 WL 133135, at *2 (6th Cir. Feb. 6, 2001); *Johnson v. Abramajtys*, No. 91-1465, 1991 WL 270829, at *9 (6th Cir. Dec. 17, 1991).  Moreover, shortly after the Sixth Circuit decision in *Bagby* the Supreme Court emphasized that the fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief.  *Estelle*, 502 U.S. at 71-72 (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983)).  Instead, the only question on habeas review is "whether the ailing instruction by itself

so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 14 (1973)), *cited in Todd v. Stegal*, Nos. 00-2203, 98-72656, 2002 WL 554500, at *3 (6th Cir. Apr. 12, 2002).

Here, there is no miscarriage of justice or fundamental defect in due process. The jury was instructed on second-degree murder and the lesser included offense of voluntary manslaughter. If the jury found that Petitioner did not possess the necessary intent for those offenses, they could have acquitted him. Because the jury found Petitioner guilty of the more serious offense of second-degree murder, it cannot be argued that they may have found him guilty of an even lesser offense. Furthermore, no clearly established Supreme Court authority requires lesser-included offense instructions in non-capital cases. Thus, this claim is not a basis for habeas relief. *Todd*, 2002 WL 554500, at *3 (citing *Estelle*, 502 U.S. at 71-72).

### B.    Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. Even if a court determines that counsel's performance was outside that

range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Applying *Strickland*, the Michigan Court of Appeals found that trial counsel was not ineffective, stating:

> Defendant claims his trial counsel was ineffective because he failed to request a jury instruction on the defense of accident and on the elements of involuntary manslaughter or otherwise object to the trial court's failure to sua sponte give such instructions. However, defendant's trial counsel argued throughout the trial that defendant did not cause Bownes' death at all, but rather that she died from an accidental overdose of cocaine. While defendant's trial counsel could have presented a defense that was inconsistent with this theory of the case, 2.111(A)(2); *People v Lemons*, 454 Mich 234, 245; 562 NW2d 447 (1997), defendant has presented no evidence that his trial counsel's decision not to do so was anything other than sound trial strategy. Furthermore, although involuntary manslaughter is a necessarily included lesser offense of second-degree murder, *People v Mendoza*, 468 Mich 527, 541; 664 NW2d 685 (2003), defendant's trial counsel may have elected not to request an instruction on this offense because he believed plaintiff had failed to meet its burden with regard to the intent elements for second-degree murder and voluntary manslaughter and, as a result, concluded that his client stood a better chance of obtaining a complete acquittal absent such an instruction. This Court will not "substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Garza*, 246 Mich App 251, 255; 631 NW2d 764 (2001). Therefore, on the limited record before us, we cannot conclude defendant's trial counsel's failure to request an instruction on the defense of accident or on involuntary manslaughter constituted performance that fell below an objective standard of reasonableness under prevailing professional norms. Consequently, defendant's trial counsel was not ineffective.

*Davis*, 2005 WL 2656646, at *9 (footnote omitted).

The petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Strickland*, 466 U.S. at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court of appeals found that Petitioner failed to overcome the presumption because trial counsel's failure to request instructions on accident and involuntary manslaughter was consistent with the theory that Petitioner did not cause

the victim's death.  I agree.  If the jury found that Petitioner did not possess the requisite intent for second-degree murder or voluntary manslaughter, he would have been acquitted.  In hindsight, this decision may seem unwise.  The Supreme Court warned in *Strickland,* however, against judging an attorney's assistance based on hindsight; a court must "evaluate the conduct from counsel's perspective at the time."  466 U.S. at 689.  From that perspective, I see no constitutional violation.

Petitioner also is unable to show prejudice.  As for the prejudice prong of the *Strickland* test, the Court instructed the "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  The prejudice prong "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  While the jury was not instructed on the defense of accident, it could have concluded from Petitioner's statements to police that he did not possess the necessary intent for second-degree murder or voluntary manslaughter and acquitted him.  Moreover, because the jury convicted Petitioner of second-degree murder, rather than the lesser offense of voluntary manslaughter, it is implausible that the jury would have found him guilty of the even lesser offense of involuntary manslaughter.  Therefore, I cannot find that the decision of the court of appeals is an unreasonable application of *Strickland*.

V.    Sentencing Errors

Petitioner claims that the trial court inaccurately scored offense variable 10 and 13, in violation of his due process rights.  He further claims that his maximum sentence was increased based upon facts that were not found by a jury beyond a reasonable doubt.

- 23 -

Offense Variable (OV) 10 considers whether a defendant exploited a vulnerable victim when committing the sentencing offense. MICH. COMP. LAWS § 777.40(1). Under OV 10, five points are scored if a defendant is found to have exploited a victim who was under the influence of drugs or alcohol at the time the offense was committed. MICH. COMP. LAWS § 777.40(1)(c). The trial court scored five points under OV 10 because the victim was under the influence of drugs at the time of her death. Petitioner does not dispute that the victim was under the influence of drugs, but contends that he was so intoxicated that he was unaware of the victim's death. He further argues that he did not force the victim to smoke crack and there was no showing that he intended to exploit her condition for unethical purposes.

Offense Variable 13 covers a continuing pattern of criminal behavior. MICH. COMP. LAWS § 777.43(1). A defendant should receive 25 points under OV 13 if "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person." MICH. COMP. LAWS § 777.43(1)(b); *People v. Francisco,* 711 N.W.2d 44, 46 (Mich. 2006). The statute requires that "all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction." MICH. COMP. LAWS § 777.43(2)(a). Petitioner concedes to committing crimes against the victim and Nikki Jackson, but claims that the prosecutor never proved that he committed a crime against Amy Thomas. The prosecutor stated at the preliminary examination that he intended to call Thomas at trial to testify that Petitioner choked her. Because Thomas never testified in this case, Petitioner contends that the trial court increased the statutory guideline range on the basis of facts which were not found beyond a reasonable doubt in violation of *Blakely v. Washington*, 542 U.S. 296 (2004).

The court of appeals concluded that Petitioner was not entitled to re-sentencing, stating:

> Defendant contends that the trial court should have scored OV 13 at zero points. Because the trial court did in fact score OV 13 at zero points, there is no error to review. Defendant also argues that OV 10 was improperly scored at 5 points. However, we note that, even if we were inclined to agree with defendant's contention that OV 10 should have been scored at zero points, it would not have altered the recommended range. See MCL 777.61. When the correct score "would not change the guidelines recommended range, remand for sentencing is not required." *People v Houston*, 261 Mich App 463, 473; 683 NW2d 192 (2004). Therefore, even if OV 10 were improperly scored, defendant would not be entitled to re-sentencing.

*Davis*, 2005 WL 2656646, at *9. Because the trial court did not score OV 13, the court of appeals declined to address Petitioner's *Blakely* claim. *Id.* at 9. n.10.

Claims concerning the improper scoring of sentencing guidelines are state law claims and are typically not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief); *Cheatham v. Hosey*, No. 93-1319, 1993 WL 478854, at *2 (6th Cir. Nov. 19, 1993) (departure from sentencing guidelines is an issue of state law, and, thus, not cognizable in federal habeas review); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (the sentencing guidelines establish only rules of state law). There is no constitutional right to individualized sentencing. *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995). Moreover, a criminal defendant has "no federal constitutional right to be sentenced within Michigan's guideline minimum sentence recommendations." *Doyle v. Scutt*, 347 F. Supp. 2d 474, 485 (E.D. Mich. 2004); *accord Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004); *Thomas v. Foltz*, 654 F. Supp. 105, 106-07 (E.D. Mich. 1987).

Although state law errors are generally not reviewable in a federal habeas proceeding, an alleged violation of state law "could, potentially, 'be sufficiently egregious to amount to a denial

of equal protection or of due process of law guaranteed by the Fourteenth Amendment.'" *Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005) (citations omitted). *See also Doyle,* 347 F. Supp. 2d at 485 (a habeas court could not set aside, "on allegations of unfairness or an abuse of discretion, terms of a sentence that is within state statutory limits unless the sentence is so disproportionate to the crime as to be completely arbitrary and shocking.") (Citation omitted). A sentence may violate due process if it is based upon material "misinformation of constitutional magnitude." *Koras,* 123 F. App'x at 213 (quoting *Roberts v. United States,* 445 U.S. 552, 556 (1980)); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972)*; Townsend v. Burke,* 334 U.S. 736, 741 (1948). To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *Tucker*, 404 U.S. at 447; *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984); *Koras,* 123 F. App'x at 213 (quoting *United States v. Stevens,* 851 F.2d 140, 143 (6th Cir. 1988)). A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 444, 447.

Petitioner cannot show that the trial court relied upon materially false information in scoring five points for OV 10. Petitioner does not dispute that the victim was under the influence of crack cocaine at the time of her death. Rather, he essentially argues that he was unable to form the intent to exploit the victim due to his own intoxication. His disagreement with the trial court on this point clearly does not implicate his due process rights.

Petitioner's claim regarding OV 13 appears to be moot because the trial court scored zero points. Even if the trial court scored twenty-five points under OV 13, his *Blakely* claim is without merit. *Blakely* concerned the State of Washington's determinate sentencing system, which

allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge.  Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant.  The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt.  *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term.  The maximum sentence is not determined by the trial judge, but is set by law.  *See People v. Drohan,* 715 N.W.2d 778, 789-91 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8).  Only the minimum sentence is based on the applicable sentencing guideline range. *Id.; also see People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)).  Therefore, under Michigan law, the trial judge sets the minimum sentence (within a certain range), but can never exceed the maximum sentence.  *Drohan,* 715 N.W.2d at 789.

Because the trial court can never exceed the maximum sentence set by statute, Michigan's indeterminate sentencing scheme, unlike the determinate sentencing scheme at issue in *Blakely*, does not infringe on the province of the finder of fact, and, thus, does not run afoul of *Blakely*.  *See Blakely,* 542 U.S. at 304-05, 308-09.  Because the trial court in the present case sentenced Petitioner well within the parameters of Michigan's indeterminate sentencing scheme, it did not violate his Sixth Amendment rights.  Every district judge to review the issue has determined that the Michigan sentencing scheme does not implicate *Blakely*.  *See, e.g., Gray v. Bell*, No. 1:06-cv-611, 2007 WL 172519, at *3 (W.D. Mich. Jan. 19, 2007)*; Pettiway v. Palmer,* No. 1:06-cv-132,

2006 WL 1430062, at *1 (W.D. Mich. May 23, 2006); *Stanley v. Jones,* No. 1:06-cv-49, 2006 WL 1459832, at *2 (W.D. Mich. May 23, 2006); *Jones v. Trombley*, No. 2:07-cv-10139, 2007 WL 405835, at *3 (E.D. Mich. Jan. 31, 2007)*; Mays v. Trombley*, No. 2:06-cv-14043, 2006 WL 3104656, at *3 (E.D. Mich. Oct. 31, 2006); *Worley v. Palmer,* No. 2:06-cv-13467, 2006 WL 2347615, at *2 (E.D. Mich. Aug. 11, 2006); *George v. Burt*, No. 2:04-cv-74968, 2006 WL 156396, at *5 (E.D. Mich. Jan. 20, 2006); *Walton v. McKee*, No. 2:04-cv-73695, 2005 WL 1343060, at *3 (E.D. Mich. June 1, 2005). Petitioner, therefore, is not entitled to relief from the sentence imposed by the trial court.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be dismissed pursuant to Rule 4 because it fails to raise a meritorious federal claim. I further recommend that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

Dated: September 17, 2007         /s/  Joseph G. Scoville
                                  United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).